```
              IN THE UNITED STATES DISTRICT COURT
            FOR THE EASTERN DISTRICT OF VIRGINIA

                      Alexandria Division

                                )
UNITED STATES OF AMERICA        )
ex rel. BENJAMIN CARTER,        )
                                )
      Plaintiff,                )
                                )
                                )
         v.                     )        1:08cv1162 (JCC)
                                )
                                )
HALLIBURTON COMPANY et al.,     )
                                )
      Defendants.               )
                                )
```

**M E M O R A N D U M   O P I N I O N**

This matter is before the Court on Defendants Halliburton Co., Kellogg, Brown & Root Services, Inc., Service Employees International, Inc., and KBR, Inc.'s Motion to Dismiss the Second Amended Complaint and *qui tam* plaintiff Benjamin Carter's Motion to File a Sur-reply.  For the following reasons, the Court will grant in part and deny in part the motion to dismiss and deny the motion to file a sur-reply.

## I. Factual Background

The allegations in the second amended complaint are as follows.  The United States Department of Defense ("DOD") uses logistics support contracts to meet its logistical support needs during combat, peacekeeping, and humanitarian assistance missions.  (2d Am. Compl. ¶ 11).  In 1992, the DOD created the

1

Logistics Civil Augmentation Program ("LogCAP") as an umbrella contract for all support services necessary in a conflict. (2d Am. Compl. ¶ 12.) The DOD awarded LogCAP I to non-party Kellogg, Brown & Root to support its operations in Haiti, Somalia, and the Balkans. (2d Am. Compl. ¶ 12.) It awarded LogCAP II to non-party DynCorp Services. (2d Am. Compl. ¶ 12.) Then, in 2001, it awarded LogCAP III to Brown & Root Services, Inc., a predecessor of Defendant Kellogg, Brown and Root Services, Inc. ("KBRSI"), and non-party Kellogg, Brown & Root, Inc. LogCAP III supported DOD operations in Iraq, Kuwait, Afghanistan, Djibouti, the Republic of Georgia, and Uzbekistan. (2d Am. Compl. ¶ 12.)

LogCAP III is a cost-reimbursable award fee contract that obligates the United States federal government (Government) to reimburse contractors for certain costs they incur to perform the contract. (2d Am. Compl. ¶ 14.) LogCAP III contains a one percent base fee provision that entitles the contractor to a fee of one percent of the actual costs of completing the work and an award fee provision that entitles the contractor to a variable percentage of the actual costs, subject to the government's discretion and tied to the specific performance measures defined in the contract. (2d Am. Compl. ¶ 140.) Both the base fee and the award fee are awarded periodically. (2d Am. Compl. ¶ 140.)

To obtain reimbursement for costs and payments of its fees, the contractor, here, KBRSI, must submit "an invoice form

2

known as the 'DD Form 250,' or its electronic equivalent." (2d Am. Compl. ¶ 157.)[1] This form requires contractors to report "known deficiencies" and "unperformed tests" "pursuant to published guidance issued by the Defense Contract Management Agency." (2d Am. Compl. 158.) If Defendants are "caught" committing waste, fraud, or abuse under LogCAP III, the government can disallow costs, reduce the fixed base fee, the award fee, or the allowable costs, and recover treble damages and penalties in an FCA action. (2d Am. Compl. ¶ 150.)

Under LogCAP III, the DOD issued task orders ("TOs") with specific "statements of work" for designated types of work. The largest of these were TOs 59 and 89, under which KBRSI provided water purification services in Iraq. (2d Am. Compl. ¶¶ 14, 15.) Water purification services include the treatment and testing of water distributed for use by the United States Army ("Army") at base camps throughout Iraq and compliance with Army environmental standards. (2d Am. Compl. ¶¶ 14, 15.) In order to provide these services, KBRSI hired Reverse Osmosis Water Purification Unit ("ROWPU") personnel, including Benjamin Carter ("Relator" or "Carter"). (2d Am. Compl. ¶¶ 14, 15.)

---

[1] Many of the paragraphs in the Second Amended Complaint are misnumbered. For example, there are two paragraphs numbered "157." The Court refers to the paragraphs by the number that Relator assigned to them, even where that number was used twice.

In 2004, Carter, a water purification specialist with twenty years of experience, applied for a ROWPU Operator position through the website www.kbrjobs.com. (2d Am. Compl. ¶¶ 3, 28.) He filled out an employment application that included "Halliburton KBR" on the header. (2d Am. Compl. ¶ 31.) He then received employment application materials from Beth Laxton of "KBR Government Operations" with an e-mail address "@halliburton.com." (2d Am. Compl. ¶ 32.) He also signed an "Application Personnel Information Supplement" that included the header "Halliburton Companies" and stated: "In connection with my application for employment with Halliburton Inc. and/or associated companies . . . ." (2d Am. Compl. ¶ 31.)

Defendants then hired Carter as a ROWPU Operator. (2d Am. Compl. ¶ 33.) Prior to attending training for this position in Houston, Texas, Carter received an "itinerary/info packet candidate processing for LogCAP III," which included "KBR" in the header. (2d Am. Compl. ¶ 35.) In Houston, he received a "LogCAP III Project Briefing" and a "LogCAP III Orientation" binder. (2d Am. Compl. ¶¶ 36, 38.) After completing training, Carter went to Iraq, where he was stationed at Al Asad for three days in mid-January 2005. (2d Am. Compl. ¶ 41.) Al Asad had ten ROWPU personnel at that time. (2d Am. Compl. ¶ 43.) During a tour of the Al Asad ROWPU operations, Carter observed Defendants' personnel using rejected drainage water from the ROWPU process as

an input for potable and non-potable water.  (2d Am. Compl.

¶¶ 45.)  He also observed that the ROWPU Manager did not know how

to start the ROWPU itself, and learned that one of the ROWPU

Operators had no background in water purification or testing.

(2d Am. Compl. ¶ 47.)

Carter was then stationed at Ar Ramadi, Iraq from mid-

January to April 2005 as a ROWPU Operator, one of three ROWPU

personnel at the camp.  (2d Am. Compl. ¶ 50.)  The other two Ar

Ramadi personnel were ROWPU Foreman, Walter Meyers ("Meyers"),

who had occupied his position since September 1, 2004, and Dale

Lehew ("Lehew"), who was transferred from Al Asad's ROWPU

operation.  (2d Am. Compl. ¶ 59.)  The ROWPU personnel were part

of a larger group of 30-40 of Defendants' Ar Ramadi personnel who

were classified as "Trade" or "Operations and Maintenance"

personnel.  (2d Am. Compl. ¶ 60.)

At Ar Ramadi, Trade employees were required to submit

time cards showing that they had worked twelve hours per day and

84 hours per week.  (2d Am. Compl. ¶ 61.)  If the time cards

showed hours other than these, the offending employee would be

called into the Trade manager's building at the end of the work

day to change his or her time card.  (2d Am. Compl. ¶ 61.)

Because he was not performing any ROWPU work[2] between mid-January

---

[2] Carter requested ROWPU work from Meyers, but Meyers informed him that
there was no water purification or testing work to perform.

and early-March 2005, Carter resisted the 84-hour time card requirement.  (2d Am. Compl. ¶ 61.)  He was called to change his time card on several occasions.  (2d Am. Compl. ¶ 61.)  Ar Ramadi Chief of Services Warren (Tom) Smith ("Smith") also threatened Carter with termination if he did not complete his time cards in this fashion.  (2d Am. Compl. ¶ 58.)

In late-February, Meyers and Smith changed the time card submission process.  (2d Am. Compl. ¶ 66.)  Trade personnel were informed that a government auditor would be arriving at Ar Ramadi and that they were now required to leave time cards with "camp management" instead of carrying them each day, as they were instructed to do during training and had been doing until that point.  (2d Am. Compl. ¶ 67.)  Instead, at seven o'clock each evening the employees would sign a daily time card entry in Smith and Meyers's presence.  (2d Am. Compl. ¶ 67.)  They were also required to input time for Sunday on Saturday evenings.  (2d Am. Compl. ¶ 68.)  The apparent goal behind these changes was to avoid having to call employees in to correct their time cards to comply with the 84-hour requirement.  (2d Am. Compl. ¶ 67.) Under the revised procedure, every time cards submitted showed 84 hour work weeks

These time card practices continued from late-February through April 2005, and, upon information and belief, into the present.  (2d Am. Compl. ¶ 69.)  When the government auditor

arrived at the camp, between late-February and April 1, 2005, Meyers and Smith also instructed Trade personnel to "look busy" and drive around Ar Ramadi to create a false appearance that work was being done. (2d Am. Compl. ¶ 70.) Meyers also instructed Carter to personally review Lehew's time cards to ensure that they followed the 84-hour requirement. (2d Am. Compl. ¶ 73.)

Carter did no ROWPU work and was not permitted to inspect the water delivery system at Ar Ramadi until early March 2005. (2d Am. Compl. ¶ 74.) Meyers simply told him that the non-potable and potable water at Ar Ramadi was being chlorinated and was safe. (2d Am. Compl. ¶ 51.) In late March, Carter was promoted to acting ROWPU foreman for two weeks while Meyers was on vacation. (2d Am. Compl. ¶ 75.) As foreman, he was not provided with any instruction, policy, or procedures regarding the operation of the ROWPU or the maintenance of water quality standards. (2d Am. Compl. ¶ 76.) None of the equipment necessary to test water was available at Ar Ramadi. (2d Am. Compl. ¶ 78.)

On March 23, 2005, one of Defendants' employees at Ar Ramadi reported an insect larvae in his toilet bowl. (2d Am. Compl. ¶ 80.) Carter inspected the organism and then tested the water in the employee's bathroom for chlorine. (2d Am. Compl. ¶ 81.) The test was negative; Carter concluded that that the bathroom water was not fit for human use. (2d Am. Compl. ¶¶ 81,

85.)  Carter then tested several other locations at which non-potable water was distributed and stored by Defendants at Ar Ramadi, including the communications room and the non-potable water storage tanks.  (2d Am. Compl. ¶ 89.)  All of these sites were negative for chlorine; additionally, the storage tanks had been left uncovered.  (2d Am. Compl. ¶ 89.)  To conduct these tests, Carter used spectrophotometers that arrived at Ar Ramadi in late-March 2005, after Carter advised Defendants' Ar Ramadi Site Manager, Suzanne Raku Williams ("Williams") that they were a mandatory tool for Defendants' LogCAP III water testing obligations.  (2d Am. Compl. ¶¶ 82, 83.)  Carter determined that during his tenure, Meyers had not performed any tests or any purification of the water at Ar Ramadi.  (2d Am. Compl. ¶ 90.)

Carter then suggested to the KBR site managers that the military be notified to super-chlorinate the water, but Williams told him that the military was none of his concern.  (2d Am. Compl. ¶ 86.)  Carter also committed his findings and conclusions to a March 23, 2005 e-mail that he sent to Williams, Meyers, and Administrative Specialist for Trade Lisa Waterman ("Waterman").  These complaints went unaddressed.  (2d Am. Compl. ¶ 88.)

After making several additional complaints to other relevant employees of Defendants, all of which went unaddressed, Carter resigned from Defendants' employ in April 2005.  (2d Am. Compl. ¶¶ 92-101.)  He continued his investigation and continued

filing complaints with various employees of Defendants. (2d Am. Compl. ¶¶ 92-101.) Some of those employees said they had undertaken internal investigations of Carter's claims, but at no point did Defendants inform the government of their failures or the ensuing health risks. (2d Am. Compl. ¶¶ 92-101.)

Carter also alleges, on information and belief, that Defendants' ROWPU employees at Al Asad and other locations in Iraq also did not conduct the water testing and purification required by LogCAP III at any time. (2d Am. Compl. ¶ 138.) Carter also believes that Defendants billed the Government for, and were reimbursed for, non-existent ROWPU activities "performed" by all of Defendant's ROWPU personnel in Iraq. (2d Am. Compl. ¶ 138.) Carter submits an e-mail from Walter Granger ("Granger"), Defendants' Theater Water Quality Manager for Iraq and Kuwait, dated July 15, 2005, to support the allegations, regarding camps other than Ar Ramadi. (2d Am. Compl. ¶¶ 105-09.)

In short, Carter alleges that Defendants falsely billed the government for the salaries of three ROWPU personnel at Ar Ramadi, ten at Al Asad, and an unknown number at other locations in Iraq who performed no water testing or purification at those locations, and who did not work the hours billed on their time cards.

## II. Procedural Posture

Relator filed an amended complaint in the Central District of California on February 10, 2006. Defendants filed a Motion to Dismiss or Transfer Venue on September 24, 2008. Relator opposed the motion on October 6, 2008 and Defendants replied on October 14, 2008. Relator filed an ex parte application to file a sur-reply on October 21, 2008. Defendants filed an opposition and response to Relator's sur-reply on October 22, 2008. The Central District of California permitted the sur-reply and the response thereto on October 22, 2008. It granted Defendants' Motion to Transfer on November 3, 2008.

The Eastern District of Virginia received this case on November 7, 2008. On November 17, 2008, the parties filed a joint motion requesting that the Court consider the Motion to Dismiss based on the parties' previously-filed submissions in the Central District of California and one supplemental brief from each party to be filed in this Court. The Court granted this motion on November 21, 2008. Relator and Defendants filed their respective Supplemental Briefs on November 25, 2008. The Court granted the Defendants' Motion to Dismiss on January 13, 2009, but gave Relator leave to amend his allegations.

Relator filed a second amended complaint on January 28, 2009 ("Second Amended Complaint") against four defendants: Halliburton Co. ("Halliburton"), Kellogg, Brown & Root Services, Inc. ("KBRSI"), Service Employees International, Inc. ("SEI"),

and KBR, Inc. ("KBR"). Defendants moved to dismiss on February 23, 2009. Relator opposed the motion, Defendants replied. Relator then moved to file a sur-reply. Defendants opposed that sur-reply. These motions are now before the Court.

### III. Standard of Review

A Rule 12(b)(6) motion to dismiss tests the legal sufficiency of the complaint. *See Randall v. United States*, 30 F.3d 518, 522 (4th Cir. 1994). In passing on a motion to dismiss, "the material allegations of the complaint are taken as admitted." *Jenkins v. McKeithen*, 395 U.S. 411, 421 (1969) (citations omitted). Moreover, "the complaint is to be liberally construed in favor of plaintiff." *Id.* In addition, a motion to dismiss must be assessed in light of Rule 8's liberal pleading standards, which require only "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8. While Rule 8 does not require "detailed factual allegations," a plaintiff must still provide "more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 545 (2007) (citation omitted).

### IV. Analysis

The Federal False Claims Act (FCA), 31 U.S.C. § 3729 *et seq.*, creates liability for presenting a false claim to the United States government in any one of seven ways. 31 U.S.C.

§ 3729(a). It empowers private individuals to bring suit for
violations of the FCA on the government's behalf in a *qui tam*
action. *Id.* at § 3730(b). Private litigants can bring an action
on behalf of the government against anyone who "knowingly
presents, or causes to be presented, to an officer or employee of
the United States Government or a member of the Armed Forces of
the United States a false or fraudulent claim for payment or
approval." *Id.* at § 3729(a)(1) (1994).[3] Or against anyone who
"knowingly makes, uses, or causes to be made or used, a false
record or statement material to a false or fraudulent claim."
*Id.* at § 3729(a)(1)(B) (2009).[4] The term "knowingly" has a
special meaning within the FCA: "a person, with respect to
information- (1) has actual knowledge of the information; (2)
acts in deliberate ignorance of the truth or falsity of the
information; or (3) acts in reckless disregard of the truth or
falsity of the information." *Id.* at § 3729(b). "[N]o proof of
specific intent to defraud is required. *Id.*

---

[3] Congress amended the FCA on May 20, 2009, while this case and
Defendants' motion to dismiss were pending. The amendments to §§ 3729-3733
"shall apply to conduct on or after the date of enactment of the Act [May 20,
2009], except that" § 3729(a)(1)(B) "shall take effect as if enacted on June
7, 2008, and apply to all claims . . . that are pending on or after that
date." 2009 Acts. Pub. L. No. 111-21, § 4(f), 123 Stat. 1625 (May 20, 2009)
(alteration in original). Because this case was pending on June 7, 2008, the
Court has applied the amendment in § 3729(a)(1)(B) (2009) to Count 4, a claim
originally brought under § 3729(a)(2) (1994).

[4] The Court has chosen, for clarity's sake, to follow the numbering
conventions in the 2009 version of the FCA with respect to § 3729(a)(1)(B).
All of the other references to the FCA in this document apply both the
language and numbering of the 1994 version of the FCA.

Relator's Second Amended Complaint presents claims for violations of § 3729(a)(1) ("knowingly presents, or causes to be presented, to an officer or employee of the United States Government or a member of the Armed Forces of the United States a false or fraudulent claim for payment or approval") and § 3729(a)(1)(B) ("knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim"). Relator bases its § 3729(a)(1) claim on an alleged scheme by Defendants to submit fraudulent claims for payment to the Government (Count 1), the omission of required information from claims (Count 2), and the submission of claims with false express or implied certifications (Count 3). Relator bases its § 3729(a)(1)(B) claim on fraudulent statements allegedly submitted by Defendants in support of their claims for payment (Count 4).

A.  Count 1: False Claims by Means of Fraudulent Time Sheets in Violation of 31 U.S.C. § 3729(a)(1)

Count 1 of the Second Amended Complaint alleges that Defendants knowingly submitted false claims to the United States in violation of 31 U.S.C. § 3729(a)(1). Between September 2004 and April 2005, and continuing into the present, Defendants allegedly presented false claims to the Government for payment of the salaries of Ar Ramadi ROWPU personnel, knowing that these personnel had not engaged in any ROWPU activities in support of LogCAP III and had not worked the hours reflected on their time

13

sheets.  (2d Am. Compl. ¶¶ 54, 55, 58, 161.)  Relator alleges
that Defendants engaged in the same conduct with respect to Al
Asad ROWPU personnel during an unspecified time period that
includes January 2005 and continues to the present.  (2d Am.
Compl. ¶¶ 163-65.)  Finally, Relator alleges the same actions
with respect to ROWPU personnel at other unnamed sites in Iraq
beginning in April 2003 and continuing into the present.  (2d Am.
Compl. ¶ 166.)  Relator based his allegation that Defendants
failed to test and purify the water at various times at Ar Ramadi
(2d Am. Compl. ¶¶ 52, 75) and Al Asad (2d Am. Compl. ¶ 130) on
personal knowledge.  He based his allegation that Defendants
failed to do so at other locations in Iraq on information and
belief.  (2d Am. Compl. ¶¶ 131, 138.)  The Court will address the
allegations based on personal knowledge and information and
belief separately.

> 1.    Relator's Allegations Regarding Ar Ramadi and Al
>       Asad

The Court finds that Relator's allegations that
Defendants presented false claims to the Government for payment
of the salaries of Ar Ramadi and Al Asad ROWPU personnel
successfully state a claim.  Relator satisfies the pleading
requirements of Rules 12(b)(6) and 9(b).  To determine whether
Relator's allegations satisfy the requirements of Rule 12(b)(6),
the Court looks to the Fourth Circuit's "test for False Claims
Act liability," which sets forth the four elements of a FCA

14

claim. *Harrison v. Westinghouse Savannah River Co.*, 176 F.3d 776, 788 (4th Cir. 1999) (internal quotations omitted) (collecting authorities) [hereinafter *Harrison I*]. These elements are: "(1) whether there was a false statement or fraudulent course of conduct, (2) made or carried out with the requisite scienter, (3) that was material, and (4) that caused the government to pay out money or forfeit moneys due." *Id.* "[T]here is no requirement that the government have suffered damages as a result of the fraud." *Id.* at 785 n.7. The Court will evaluate each of these elements in turn.

> a.  False Statement or Fraudulent Course of Conduct

As noted above, Relator alleges that Defendants engaged in an ongoing scheme to submit to the Government claims for reimbursement of the salaries of ROWPU employees who did not perform any ROWPU work and often did not perform any work at all. (2d Am. Compl. ¶¶ 44-45, 52-56). Specifically, Relator alleges that the time sheets of the Ar Ramadi and Al Asad ROWPU workers were objectively false because they included hours that the employees did not work on ROWPU functions or did not work at all. (2d Am. Compl. ¶ 191 ("Every time sheet submitted by Defendants to the Government in support of the . . . labor of ROWPU employees stated at Ar Ramadi . . . from September 1, 2004 [through] April 2005 [was] false."), 131, 61.) This is sufficient to state the first element of Relator's § 3729(a)(1)

claim: it describes numerous false statements and a fraudulent course of conduct.

### b. <u>Scienter</u>

The second element of an FCA claim, scienter, may be alleged in a complaint based upon information and belief. *Harrison I*, 176 F.3d at 784 (*quoting* Fed. R. Civ. P. 9(b)). Relator has satisfied this requirement by alleging that specific employees of Defendants knew that the ROWPU employees did not perform any ROWPU work and did not work 84 hours per week, but directed and required ROWPU employees to submit time cards that charged such work to the Government. (2d Am. Comp. ¶¶ 54, 58, 61, 67.) He further alleges that Defendants knowingly presented or caused to be presented claims based on these false time cards to the Government for payment or approval. (2d Am. Compl. ¶¶ 157-58, 161, 163, 166.)

### c. Materiality

"Under the FCA, a statement or course of conduct is material if it has a natural tendency to influence agency action or is capable of influencing agency action." *U.S. ex rel. Wilson v. Kellogg Brown & Root, Inc.*, 525 F.3d 370, 378 (4th Cir. 2008) [hereinafter *Wilson*] (internal quotation marks and citations omitted); *see also Allison Engine Co. v. U.S. ex rel. Sanders,* __ U.S. __, 128 S. Ct. 2123, 2130-31 (2008).

The Court finds that Relator has successfully pled that Defendants' actions were material to the Government's decision to make payments under LogCAP III.  First, Relator alleges that the ROWPU employees' time cards were the bases of the invoices submitted to the Government for payment.  (2d Am. Comp. ¶¶ 37-38, 57.)  He also alleges that the Government required the periodic submission of invoices for Defendants to obtain reimbursement. (2d Am. Comp. ¶ 167.)

       d.   <u>Causing the Government to Pay Out Money</u>

Relator sufficiently pleads that Defendants' fraud caused the Government to pay out money.  He claims that the invoices caused the Government to reimburse Defendants for the salary expenses of the Ar Ramadi and Al Asad ROWPU employees. (2d Am. Comp. ¶¶ 37, 38, 139-40.)  As a further result of these allegedly false time cards and invoices, the government also paid Defendants greater indirect costs, a higher base fee, and a higher award fee.  (2d Am. Compl ¶ 167.)

       e.   <u>Heightened Pleading Requirements of Rule 9(b)</u>

Because Relator has stated a claim under Rule 12(b)(6), the Court must next evaluate whether the allegations in Count 1 relating to the Ar Ramadi and Al Asad ROWPU workers satisfy the heightened pleading requirements of Federal Rule of Civil Procedure 9(b).  "In alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or

mistake." Fed. R. Civ. P. 9(b). Those "circumstances" are "the time, place, and contents of the false representations, as well as the identity of the person making the misrepresentation and what he obtained thereby." *Harrison I*, 176 F.3d at 784 (internal quotations omitted) (collecting authorities).

The purpose of this rule is to put the defendant on notice of the conduct complained of, to eliminate fraud actions in which all the facts are learned after discovery, to protect defendants from frivolous claims, and to protect defendants from the harm to their goodwill and reputation that may result from fraud claims. *Id.* at 784 (citation omitted). Failure to comply with Rule 9(b) is treated as a failure to state a claim under Rule 12(b)(6). *Id.* at 783 n.5. The heightened pleading requirements of Rule 9(b) apply to FCA actions. *Id.* at 784. Nonetheless, "[a] court should hesitate to dismiss a complaint under Rule 9(b) if [it] is satisfied (1) that the defendant has been made aware of the particular circumstances for which she will have to prepare a defense . . . and (2) that plaintiff has substantial prediscovery evidence of those facts." *Harrison I*, 176 F.3d at 784.

Relator's amended complaint specifically addresses the "time, place, and contents of the false representations, as well as the identity of the person making the misrepresentation and what he obtained thereby." *Harrison I*, 176 F.3d at 784

(citations omitted). First, the alleged time and place of Defendants' false representations was either bi-weekly or monthly from September 1, 2004 through April 2005 for Ar Ramadi, and during January 2005 for Al Asad. (2d Am. Compl. ¶¶ 161, 163, 167.) The persons alleged to have made the misrepresentations include Defendants' employees Smith, Meyers, Carter, Lehew, the ten ROWPU personnel at Al Asad, and the Defendant corporations generally. (2d Am. Compl. ¶¶ 161, 163, 167.) The places that the misrepresentations allegedly occurred were Ar Ramadi and Al Asad. (2d Am. Compl. ¶¶ 161, 163, 167.) In accordance with the LogCAP contract, the misrepresentations were then transmitted to Defense Finance and Accounting Service in Rock Island, Illinois. (2d Am. Compl. ¶ 160.) The contents of the misrepresentations - the ROWPU hours and other work hours falsely billed for - and what was obtained thereby - payment of ROWPU workers' salaries by the Government - have been addressed above, in section A.1.a and A.1.d, respectively.

Defendants submit that the Court must dismiss Count 1 under Rule 9(b) because Relator does not allege fraud with sufficient specificity. They submit that he is required to allege that the named ROWPU employees performed no work whatsoever during any of the hours that Defendants charged the Government for their work and that he must specifically "point to a single invoice or a particular timecard" that shows recorded

time for unperformed work.  (Defs.' Mot. to Dismiss 10-11.)
Defendants appear to be looking for invoice numbers or time card
numbers, if such things exist.

Defendants' argument that 9(b) requires such
specificity is without merit.  An allegation that a defendant
"tried to get paid for work it had not done" is a claim that can
be brought "straight-forwardly under the FCA." *Wilson*, 525 F.3d
at 379 (*citing Harrison I*, 176 F.3d at 786); *see also United
States v. Menominee Tribal Enters.*, 601 F. Supp. 2d 1061, 1072
(E.D. Wis. 2009) (denying motion for summary judgment on FCA
claims over defendants' argument they had not tried to obtain
payment for work not done, just lied about how their actual
reimbursable expenses were incurred).  The specific allegations
that Defendants demand are simply not material to Relator's
ability to put Defendants on notice of "the particular
circumstances for which [they] will have to prepare a defense" or
to convince the Court that he possesses "substantial prediscovery
evidence of th[e relevant] facts."  *Harrison I*, 176 F.3d at 784.
It is generally recognized that, "particularly in the context of
federal FCA cases," it is impractical to require a "plaintiff to
plead the facts of each individual claim, particularly where the
claims are numerous and extend over the course of several years."
*United States v. Gwinn*, 2008 WL 867927, at *13 (S.D. W. Va. Mar.
31, 2008) (internal quotation and alteration omitted) (*citing*

*U.S. ex rel. Landsberg v. Argentis Med., P.C.*, 2006 U.S. Dist.
LEXIS 96621, at *11-12 (W.D. Pa. Apr. 17, 2006), *adopted by* 2006
WL 1788381 (W.D. Pa. June 27, 2006); *United States v. Kensington
Hosp.*, 760 F.Supp. 1120, 1123 (E.D. Pa. 1991); *U.S. ex rel. Pogue
v. Diabetes Treatment Ctrs. of Am., Inc.*, 238 F. Supp. 2d 258,
268 (D.D.C. 2002); *U.S. ex rel. Thompson v. Columbia/HCA
Healthcare Corp.*, 20 F. Supp. 2d 1017, 1049 (S.D. Tex. 1998)).
As the Southern District of Texas aptly put it:

> The basic framework, procedures, the nature of fraudulent
> scheme, and the financial arrangements and inducements
> among the parties . . . that give rise to Relator's
> belief that fraud has occurred have been alleged with
> specificity; Plaintiffs are entitled to discovery before
> being required to list every false claim, its dates,
> [and] the individuals responsible . . . .

*Thompson*, 20 F. Supp. 2d at 1049.  Like the Southern District of
West Virginia, this Court finds this rationale persuasive.
*Gwinn*, 2008 WL 867927, at *13 (*quoting Thompson*, 20 F. Supp. 2d
at 1049).

        The Court finds that Relator has pled the "time, place,
and contents of the false representations, as well as the
identity of the person making the misrepresentation and what he
obtained thereby," to the best of his ability and knowledge.
*Harrison I*, 176 F.3d at 784 (citations omitted).  To the extent,
if any, that these allegations do not meet the letter of the Rule
9(b) standard, the Court finds that it would still be
inappropriate to dismiss this claim under *Harrison I*.  Viewing

all of the allegations in the light most favorable to the plaintiff, *Jenkins v. McKeithen*, 395 U.S. 411, 421 (1969), the Court is satisfied that Relator possesses substantial pre-discovery evidence of the facts relevant to his § 3729(a)(1) claim pertaining to Ar Ramadi and Al Asad, *see Harrison I*, 176 F.3d at 784. The Court is also satisfied that Defendants have received adequate notice of the facts relevant to Relator's claim. *Id.* Further, contrary to Defendants' arguments, Relator need not include the number, date and time of every invoice or time card submitted over the course of two years in order to survive a motion to dismiss. *See Gwinn*, 2008 WL 867927, at *13. Such a requirement would be irrelevant to both the general purposes of the federal system of notice pleading and the more specific goals of Rule 9(b) in FCA cases. *See Harrison I*, 176 F.3d at 784. "Relator has set out a sufficiently 'detailed description'" of Defendants' alleged "scheme" of misrepresentations "and its 'falsehoods.'" *Gwinn*, 2008 WL 867927, at *13. Relator has stated a § 3729(a)(1) claim in Count 1 with respect to Defendants' Ar Ramadi and Al Asad ROWPU workers.

> 2. *Relator's Allegations Regarding Other Camps in Iraq*

Relator's allegations regarding ROWPU personnel at other sites in Iraq, however, do not satisfy Rule 9(b). Relator

fails to include any information about the circumstances surrounding, or the personnel involved in, the allegedly false claims. (2d Am. Compl. ¶ 166.) It is clear that, with this claim, Relator is merely extrapolating from his personal knowledge about two specific sites in Iraq to obtain discovery regarding all of Defendant's other sites in Iraq. This is precisely the kind of fishing expedition that the Fourth Circuit sought to prevent in *Harrison I*. 176 F.3d at 784. The Court will not allow these unsupported claims, regarding which Relator possesses no pre-discovery information, to continue. Count 1, as it pertains to unnamed sites in Iraq, will be dismissed.

B.  Count 2: False Statement by Omission of Required Information in Violation of 31 U.S.C. § 3729(a)(1)

In his next claim, Relator alleges that Defendants made false statements to the Government by omitting required information from their claims for payment or approval, in violation of 31 U.S.C. § 3729(a)(1). Specifically, Relator submits that the LogCAP contract required Defendants to submit DD-250 forms, or their electronic equivalents, to the Government (2d Am. Compl. ¶ 157) and to report "known deficiencies" and "unperformed tests" on those forms (2d Am. Compl. ¶ 169). Relator then alleges that Defendants failed to test the water at Ar Ramadi, Al Asad, and other sites in Iraq, but did not disclose these failures on the DD-250 Forms that they submitted to the Government. (2d Am. Compl. ¶ 170.)

Defendants argue that, even assuming that Relator's allegations are true, the Court must dismiss this claim under Rule 12(b)(6) because Relator does not allege a legal obligation by Defendants to disclose unperformed tests. (Defs.' Mot. to Dismiss 16.) Without such a legal obligation, a claim for false statement by omission cannot stand. *United States ex rel. Berge v. Bd. of Trustees of the Univ. of Ala.*, 104 F.3d 1453, 1461 (4th Cir. 1997); *United States ex rel. Milam v. Regents of Univ. of Cal.*, 912 F. Supp. 868, 883 (D. Md. 1995) (finding no false statement by way of omission where defendants were not obligated to disclose the absent information). In response, Relator argues that Defendants' legal obligation to disclose this information arises from the DD-250 forms themselves, which LogCAP required Defendants to submit periodically. (Relator's Opp'n 5-6.)

Other *qui tam* plaintiffs have attempted to use the DD-250 form as the basis of a contractor's obligation to disclose known deficiencies in its performance. This Court, however, has found that the form does not obligate a contractor to make such disclosures. In *United States ex rel. Wilson v. Kellogg Brown & Root, Inc.*, No. 1:04cv595 (E.D. Va. Apr. 6, 2007), *aff'd on other grounds*, 525 F.3d 370, 373 (4th Cir. 2008) the Court held that "[t]he signing of the certification forms [DD-250 and DD-1155] . . . do[es] not demonstrate sufficient claim for fraud." *Id.* at Hr'g Tr. on Mot. to File Third Am. Compl. 22-23. Relator has not

put forth argument or evidence showing why this Court should depart from its earlier decision on this issue.

Further, an analysis of the face of the DD-250 Form fails to provide the Court with a reason to depart from this finding. With their motion to dismiss Defendants submit a blank DD-250 form. (Defs.' Mot. to Dismiss Ex. 5.) It is "well-established that a district court ruling on a 12(b)(6) motion to dismiss may consider documents 'sufficiently referred to in the complaint' whose authenticity is not disputed, even if such documents are not attached to the complaint." *Koken v. Aon Risk Serv., Inc.*, 2006 WL 90068, *3 (E.D. Va. 2006) (*citing Watterson v. Page*, 987 F.2d 1, 3 (1st Cir. 1993)); *GFF Corp. v. Assoc. Wholesale Grocers, Inc.*, 130 F.3d 1381, 1385 (10th Cir. 1997). The Court finds that it may consider this form in deciding the pending motion to dismiss: Relator repeatedly refers to the DD-250 in the Second Amended Complaint (2d Am. Compl. ¶¶ 157-58, 169-72), his allegations in Count 2 rely on the form, and Relator has not disputed the completeness or accuracy of Defendants' exhibit.

The blank DD-250 Form is titled "Material Inspection and Receiving Report" and contains space for the providing contractor to list the items or services received by the government and a signature block for an "authorized government representative" to certify that delivery of the listed items "has

been made" and that the goods "conform to the contract, except as noted herein or supporting documents." (Defs.' Mot. to Dismiss Ex. 5.) The form does not contain a space for the contractor's signature or include any "certification" that might be activated by merely completing the form.

In line with the Court's previous decision of on this exact issue, the Court finds that the DD-250 form does not create a legal obligation for a contractor to disclose alleged deficiencies in the goods or services that it provides in a way that could support a § 3729(a)(1) claim. To hold otherwise, as noted by both this Court and the Fourth Circuit, "would render meaningless the fundamental distinction between actions for fraud and breach of contract." *Wilson*, 525 F.3d at 378. Relator clearly alleges that the Defendants breached their contract with the Government: he alleges that their services did not conform to LogCAP III's requirements. This, however, is not the proper subject of an FCA claim. The FCA was not implemented to involve relators in determining the terms of government contracts and whether they have been breached.

Relator's allegations regarding Count 2 also fail to meet the requirements of Rule 9(b). In *Wilson*, the Fourth Circuit found that, even though the relator included details regarding the relevant DD form, "such as what it was, when it was signed, and by whom it was signed," its claim was still dismissed

under Rule 9(b) because it "lack[ed] any specific facts about several important elements of the alleged scheme, including how the DD Form 1155 influenced the government's decision."  525 F.3d at 379 (affirming district court's denial of leave to file a third amended complaint for an FCA claim).  Here, Relator did not include the information found insufficient in *Wilson* - information regarding what a DD-250 form is, when it was signed or who signed it.  The Court thus concludes that, "if allowed to go forward, Relator['s] FCA claim would have to rest primarily on facts learned through the costly process of discovery.  This is precisely what Rule 9(b) seeks to prevent."  *Wilson*, 525 F.3d at 379 (*citing Harrison I*, 176 F.3d at 789 ("The clear intent of Rule 9(b) is to eliminate fraud actions in which all the facts are learned through discovery after the complaint is filed.")).  The Court will dismiss Count 2 of the Second Amended Complaint.

   C.   <u>Count 3: False Statement by Express or Implied Certification in Violation of 31 U.S.C. § 3729(a)(1)</u>

        In Count 3 of his complaint, Relator alleges that Defendants submitted to the Government claims for payment or approval that contained false express or implied certifications that Defendants' performance of LogCAP III conformed to that contract, in violation of 31 U.S.C. § 3729(a)(1).  (2d Am. Compl. ¶¶ 178-79.)  The Court will address Relator's express certification and implied certification theories in turn.

1. *Express Certification*

An express certification claim exists "when a government contract or program required compliance with certain conditions as a prerequisite to a government benefit, payment or program; the defendant failed to comply with those conditions; and the defendant falsely certified that it had complied with the conditions in order to induce the government benefits." *Harrison I*, 176 F.3d at 786. Relator alleges that DD-250 Forms and their electronic equivalents "expressly certify that the contractor's performance conforms to the contract." (2d Am. Compl. ¶ 180-81.) He further alleges that Defendants knowingly included false DD-250 Forms with their claims for payment of Defendants' ROWPU employees' salaries from August 2004 to April 2005. (2d Am. Compl. ¶¶ 184-86.)

a. <u>DD-250 Form</u>

Essential to this claim is Relator's allegation that DD-250 Forms or their electronic equivalents expressly certify "that the contractor's performance conforms to the contract." (2d Am. Compl. ¶¶ 180-81.) Defendants submit, however, that Relator's claim must fail because, just as the DD-250 Form cannot serve as a basis for a fraudulent omission claim, it also cannot serve as a basis for a fraudulent express certification claim. (Defs.' Mot. to Dismiss 19-20.)

Two unpublished decisions of this Court have held that
the DD-250 does not constitute a false express certification by a
contractor. *U.S. ex rel. Godfrey v. Kellogg, Brown & Root, Inc.*,
No. 1:05cv1418, (E.D. Va. Mar. 13, 2008) (Mem. Order on Mot. to
Dismiss 10-11); *U.S. ex rel. Wilson v. Kellogg Brown & Root,
Inc.*, No. 1:04cv595 (E.D. Va. Apr. 6, 2007) (Hr'g Tr. on Mot. to
File Third Am. Compl. 23). The Eleventh Circuit also addressed
this issue and found that the DD-250 Form does not constitute a
certification by a contractor that his products conform to the
contract. *United States v. Cannon*, 41 F.3d 1462, 1468 (11th Cir.
1995), *cert. denied*, 516 U.S. 823 (1995). "It was through the
failure of the [government representative] to perform an adequate
review that the nonconforming material was certified." *Id.* at
1468-69 (reversing the district court's denial of his motion for
acquittal on criminal charge of making false statements to the
Government).

Relator again fails to put forth argument or evidence
that would support a departure from this Court's earlier
decisions on this issue. In line with its previous decisions and
the similar decision by the Eleventh Circuit, the Court finds
that the DD-250 Form does not constitute an express certification
by the contractor of his compliance with the terms of the
relevant contract. Relator cannot state a false certification
claim under the FCA based solely on Defendants' allegedly false
statements on those forms. Thus, even viewing all the

allegations in the complaint in the light most favorable to the Relator, he has not alleged a cognizable legal claim.

    2. *Implied Certification*

Under his implied false certification theory, Relator argues that the FCA, under 31 U.S.C. § 3729(a)(1), attaches liability to the submission of a claim by a contractor that knows that it has not complied with a contract term, statute, or regulation. (2d Am. Compl. ¶¶ 187-89.) Under this theory, the submission of a claim for payment constitutes an "implicit[] certifi[cation]" that the contractor has fully performed the relevant portion of the contract. *U.S. ex rel. Quinn v. Omnicare, Inc.*, 382 F.3d 432, 441-42 (3d Cir. 2004).

This theory, however, has not been recognized in the Fourth Circuit, which has, in fact, expressed doubt as to whether implied certification liability can exist. *Harrison I*, 176 F.3d at 786-87, 787 n.8. Further, the majority of circuits that have allowed implied certification claims have limited recovery to instances where the contractor's certification of compliance with the contract was a prerequisite to payment under the contract. *See U.S. ex rel. Quinn v. Omnicare Inc.*, 382 F.3d 432, 443 (3d Cir. 2004); *United States ex rel. Siewick v. Jamieson Sci. & Eng'g, Inc.*, 241 F.3d 1372, 1376 (D.C. Cir. 2000) (collecting cases); *accord Harrison I*, 176 F.3d at 793. Relator makes no allegations regarding whether the Government's payments to

Defendants were conditioned upon a certification of compliance. Thus, even if this Court were to allow an implied certification claim to proceed, Relator's claim would fail for lack of a required.

Relator argues that, since 2003, when this Court last noted that implied certification claims were likely not viable in this Circuit, *see United States ex rel. Herrera v. Danka Office Imaging Corp.*, No. 00cv1702A, Mem. Op. 10 (E.D. Va. June 22, 2003), the weight of national precedent has shifted in favor of implied certification. (Relator's Opp'n 7.) The cases that Relator relies on to support his argument, however, show that only two districts within the Ninth Circuit have recognized an implied certification claim since 2003. *U.S. ex rel. Berglund v. Boeing Co., Inc.*, 2007 WL 473757, *3 (D. Or. Feb. 5, 2007); *U.S. ex rel. Holder v. Special Devices, Inc.*, 296 F. Supp. 2d 1167, 1176 (C.D. Cal. 2003). Nothing in Relator's argument convinces this Court that the Fourth Circuit would choose to recognize an implied false certification claim, in spite of its statements implying the contrary in *Harrison I*. The Court will dismiss Count 3 of the Second Amended Complaint.

D.   Count 4: Use of False Records or Statements Violation of 31 U.S.C. § 3729(a)(1)(B)

The Second Amended Complaint also alleges that defendants knowingly made or used false records or statements material to a false claim, in violation of 31 U.S.C.

§ 3729(a)(1)(B). (2d Am. Compl. ¶ 192.) This section attaches liability to a party who makes or uses false records, while the previous section only attaches liability to one who makes the false claim. Relator submits that "[e]very timesheet submitted by Defendants to the Government" in support of the salaries of Ar Ramadi ROWPU employees from September 1, 2004 to April 2005 was false.[5] (2d. Am. Compl. ¶ 191.) He also alleges that Defendants presented false statements to the Government to support their claims for the salaries of Meyers, Carter, and Lehew for the following pay periods: September 1, 2004 to May 27, 2005 for Meyers; January 19, 2005 to April 17, 2005 for Carter, and February 14, 2005 to May 27, 2005 for Lehew. (2d Am. Compl. ¶ 192.) It appears that the statements referred to in ¶ 192 are in addition to and different from those contained in the time cards mentioned in ¶ 191. Finally, Relator alleges that Defendants presented false statements to support their claims for the salaries of all other ROWPU personnel in Iraq from the beginning of the applicable limitations period through the conclusion of this suit. (2d Am. Compl. ¶ 192.) Relator does not allege whether these false statements were made in the time cards or somewhere else. The Court will address each of these allegations below.

---

[5] The allegation does not include Al Asad ROWPU employees.

1.  *Rule 9(b): Pleading Fraud with Particularity*

As discussed in section A.1 above, Rule 9(b) requires a party "alleging fraud or mistake" to "state with particularity" "the time, place, and contents of the false representations, as well as the identity of the person making the misrepresentation and what he obtained thereby." *Harrison I*, 176 F.3d at 784. The Court finds that, for the same reasons discussed in section III.A.2 above, Relator's allegations regarding the time sheets submitted by its ROWPU employees in Ar Ramadi satisfy the requirements of Rule 9(b). Relator's other allegations, however, fail to satisfy this standard.

First, Relator's allegations regarding Ar Ramadi ROWPU employees' allegedly false time cards are stated with sufficient specificity. The complaint sets forth extensive factual allegations regarding the time cards of Relator (2d Am. Compl. ¶¶ 52-58) and the other Ar Ramadi ROWPU employees (2d Am. Compl. ¶¶ 59-79). The Court is satisfied that Relator has set forth the "time, place, and contents of the false representations, as well as the identity of the person making the misrepresentation and what he obtained thereby," in his complaint. *Harrison I*, 176 F.3d at 784. To the extent, if any, that he has not, the Court is nonetheless satisfied that Relator possesses substantial pre-discovery evidence of the relevant facts and that Defendants have received adequate notice of the facts relevant to this claim. *See Harrison I*, 176 F.3d at 784.

It is clear, however, that Relator's other allegations - regarding the unspecified false statements relating to the salaries of ROWPU employees in Ar Ramadi and throughout Iraq from the beginning of the applicable limitations period through the conclusion of this suit - do not satisfy Rule 9(b). (2d. Am. Compl. ¶ 192.) Most glaringly, Relator provides no detail about the contents of the allegedly false statements and no explanation of how those contents were false. He merely alleges that "each statement submitted in support of claims for payment" was knowingly fraudulent. (2d. Am. Compl. ¶ 192.) Relator does not attempt to identify who made or submitted these unspecified statements. It is clear from these bare-bones allegations that Relator does not possess "substantial prediscovery evidence" of the relevant facts. *Harrison I*, 176 F.3d at 788. While Relator need not plead every detail necessary to bear his burden of proof, he is required to present some pre-discovery knowledge of the specifics of his claim. *Id.* The Court cannot allow these insufficiently-pled claims to continue. Count 4, as it relates to false statements other than the time cards of the ROWPU employees stationed at Ar Ramadi - which were clearly pled in ¶ 191 of the complaint - will be dismissed.

2. *Rule 12(b)(6): Stating a Claim Upon Which Relief Can be Granted*

The Court must next address whether the allegations related to the Ar Ramadi ROWPU time cards state a claim in

34

accordance with Rule 12(b)(6).  To do this, the Court will again look to the Fourth Circuit's "test for False Claims Act liability": "(1) whether there was a false statement or fraudulent course of conduct, (2) made or carried out with the requisite scienter, (3) that was material, and (4) that caused the government to pay out money or forfeit moneys due." *Harrison I*, 176 F.3d at 788.  For the same reasons discussed extensively in section III.A.1 above, the Court finds that these allegations state a cognizable § 3729(a)(1)(B) claim against Defendants.

E.   KBR, Inc., Halliburton Company, and Service Employees International as Defendants

Defendants argue that KBR, Halliburton, and SEI are not proper defendants to this action because they are not parties to LogCAP III and because Relator did not allege the claims against them with sufficient specificity to satisfy Rule 9(b).  (Defs.' Mot. to Dismiss 9.)  Defendants submit that Relator simply "lumps [Defendants] together" and fails to "apprise each defendant of the specific nature of his or her participation in the fraud." (Defs.' Mot. to Dismiss 9 (*quoting U.S. ex rel. Brooks v. Lockheed Martin Corp.*, 423 F. Supp. 2d 522, 526 (D. Md. 2006) (internal quotations and citation omitted), *aff'd in part, dismissed in part*, 237 Fed. Appx. 802 (4th Cir. 2007)).)

The Court notes that *Brooks* is not completely on point because, in that case, the court dismissed the relator's entire FCA claim for failure to specifically identify any person or

corporation making the alleged misrepresentations.  *Id.* at 527-28.  Here, Defendants seek to be individually dismissed from an action in which valid FCA claims have been stated.  Further, in *Brooks*, the court found that the relator could not avoid the requirements of Rule 9(b) "by claiming that certain . . . information [was] in the exclusive possession and control of the Defendants."  *Id.* at 527 n. 15.  Relator has not relied on such an allegation here.

The general principle exists that "where there are multiple defendants, plaintiffs must allege all claims with particularity as to each defendant."  *Dealers Supply Co., Inc. v. Cheil Indus., Inc.*, 348 F. Supp. 2d 579, 589 (M.D.N.C. 2004) (*citing Adams v. NVR Homes, Inc.*, 193 F.R.D. 243, 251 (D. Md. 2000)).  "The identity of the person making the misrepresentation is particularly important where there are multiple defendants."  *Id.* at 589-90.  And courts often "reject pleadings in which multiple defendants are 'lumped together' and in which 'no defendant can determine . . . which of the alleged representations it is specifically charged with having made . . . ."  *Id.* at 590 (citations omitted) (dismissing plaintiff's claims for failure to satisfy Rule 9(b)).  At least one court, however, allowed FCA allegations against multiple defendants to proceed where the plaintiff "individually listed each defendant in many of its allegations" and "it [wa]s clear

from the allegations that the [plaintiff wa]s indicating that all defendants undertook the actions described." *United States v. Gwinn*, 2008 WL 867927, at *13 (S.D. W. Va. Mar. 31, 2008).

The Second Amended Complaint names each Defendant individually and alleges that each Defendant submitted false claims or caused false claims to be submitted to the Government. (2d Am. Compl. ¶¶ 158, 161, 163 (Count 1), 191 (Count 4).) Relator further identifies both the entity directly submitting the alleged false statements to the Government - KBRSI - (2d Am. Compl. ¶ 157) and the specific people writing the false statements - Ar Ramadi ROWPU personnel (2d Am. Compl. ¶¶ 54-61). He also alleges that the ROWPU employees at Ar Ramadi and Al Asad, including Smith, Meyers, and Lehew, were employed by "Defendants" or were "Defendant" personnel  (2d. Am. Compl. ¶¶ 47, 51, 54, 59.)  Finally, Relator alleges that Defendants underwent "labyrinthine corporate re-organizations" (2d Am. Compl. ¶¶ 6-8) and blurred their internal corporate lines (2d Am. Compl. ¶ 3 n.1).  Specifically, when discussing his own position, Relator submits that he obtained his ROWPU job through the "KBRJobs.com" website, that his employer was SEI, that Halliburton personnel trained him prior to his departure for Iraq, and that Halliburton/KBR treated him as an employee and, after he resigned, as a former employee.  (2d Am. Compl. ¶ 3 n.1.)

The Court could interpret this final allegation by Relator in one of two ways. First, Relator could be arguing that Defendants' conduct has made it impossible for him to deduce each Defendant's precise role in, and responsibility for, the false statements. Second, Relator could be arguing that Defendants' conduct has made it impossible for him to deduce which of the defendant corporations were responsible for the actions of the employees that he named in the complaint. The court has not located any jurisdiction that has addressed this issue and the parties did not submit argument on this point.

Based on the specific averments discussed above, the Court finds that allegations that otherwise survive Defendants' motion to dismiss are sufficient to state claims against all four Defendants. Relator has listed the Defendants individually in varying allegations and it is clear from the allegations that Relator is claiming that all three of the Defendants that wish to be dismissed - KBR, Halliburton, and SEI - "undertook the actions described." *Gwinn*, 2008 WL 867927, at *13. It is premature, at this stage of this litigation, for the Court to determine from which of the entities with convoluted and changing corporate structures the Government and Relator may be entitled to recover. Dismissing all of the defendants but KBRSI at this early stage in the litigation could require Relator to bring multiple suits or play what is essentially a guessing game while the statute of limitations runs in order to resolve his claims.

Finally, the Court notes that Defendants' argument that the Court should dismiss KBR, Halliburton, and SEI from this action because they are not parties to the LogCAP III contract has no merit. Relator has not brought a breach of contract claim. Such a claim would not be not actionable under the FCA. Rather, Relator has successfully stated a claim for fraud upon the Government. If all four defendants participated in that fraud, either by knowingly making false claims, or knowingly making false records material to false claims, the lack of a contractual relationship would not bar liability for their fraudulent actions. Defendants have cited no authority limiting fraud liability to the parties or terms of the contract.

F.    Relator's Motion to File a Sur-reply

Relator also moved to file a sur-reply to respond to what he asserts are "six points of new material" raised in Halliburton's reply brief. (Mot. for Leave to File Surreply 1.) Relator claims that Halliburton's reply brief "raises a plethora of new . . . arguments" and "contains several mischaracterizations of both Relator's position and the allegations in the Second Amended Complaint." (Mot. for Leave to File Surreply 1.)

The Court notes at the outset that a sur-reply is not a proper means to counter "mischaracterizations" of the non-movant's position. A court has the discretion to allow a sur-reply where a party brings forth new material or deploys new

arguments in a reply brief.  *See, e.g.*, *Lewis v. Rumsfeld*, 154 F.
Supp. 2d 56, 61 (D. D.C. 2001).  Where a party "seeks merely to
re-open briefing on the issues raised in [a] motion to dismiss
and challenge [the movant's] explanations of cited case law," a
sur-reply should not be allowed.  *Interphase Garment Solutions,
LLC v. Fox Television Stations, Inc.*, 566 F. Supp. 2d 460, 467
(D. Md. 2008).

Relator, then, may not submit a sur-reply simply
because Halliburton used its reply brief to further support an
argument made in its opening brief or to respond to the arguments
in Relator's opposition.  Here, none of the "new arguments" cited
by Relator in his proposed sur-reply is truly new.  They were
either raised in previous filings made by Halliburton or merely
respond to Relator's arguments in opposition to the motion to
dismiss.  If Relator disagreed vigorously with the contentions in
Defendants' reply brief, he was free to raise those disagreements
at oral argument.  To the extent that any new arguments were
raised in Defendants' reply, the Court has not relied on them.
The Court will deny Relator's motion to file a sur-reply.

## IV.  Conclusion

For these reasons, the Court will deny Defendants'
Motion to Dismiss Count I as that claim pertains to Ar Ramadi and
Al Asad, grant Defendants' Motion to Dismiss the remainder of
Count 1, grant Defendants' Motion to Dismiss Counts 2 and 3 in

their entirety, deny Defendants' Motion to Dismiss Count 4 as it relates to the time cards of the Ar Ramadi ROWPU employees, grant Defendants' Motion to Dismiss the remainder of Count 4, and deny Relator's Motion to File a Sur-reply.

An appropriate Order will issue.

July 23, 2009                    _____/s/_____
Alexandria, Virginia                    James C. Cacheris
                              UNITED STATES DISTRICT COURT JUDGE